Filed 1/7/22  In re A.F. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.F., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>　　Plaintiff and Respondent;<br>　v.<br><br>N.P.,<br><br>　　Defendant and Appellant. | E077222<br><br>(Super.Ct.No. J282606)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

The San Bernardino County Department of Children and Family Services (CFS) intervened on behalf of A.F. and her older half-brother L.T., after a domestic violence incident in a Walmart store in which the cart that A.F. was seated in her car seat, was knocked over. L.T. was maintained in the home of his custodial father, but A.F. was removed from her parents' custody. After 12 months, services were terminated, visitation was reduced to once a month, and the matter was referred for a hearing pursuant to Welfare and Institutions Code[1], section 366.26. At the section 366.26 hearing to select and implement the proposed permanent plan of adoption, parental rights were terminated, and mother appealed.

On appeal, mother argues that her due process rights were violated because she was prevented from establishing a beneficial parent-child relationship through no fault of her own, by the emergency pandemic orders that precluded face-to-face visits with her child. We affirm.

## BACKGROUND

In July 2019, mother and father were shopping in Walmart with mother's child from a previous relationship, L.T., age 5, and A.F., the two-month-old child of mother and father, who was placed in a shopping cart in her car seat. The father punched mother multiple times in the face and kicked her in the children's presence (as well as the

---

[1] All further statutory references are to the Welfare and Institutions Code except where otherwise indicated.

2

presence of bystanders), causing A.F. to fall out of the shopping cart while still in her car seat. Bystanders called police and father was arrested.

While investigating the referral, the social worker interviewed mother who appeared to be under the influence of drugs or alcohol, because she appeared lethargic, was disheveled, seemed depressed, and had slurred speech. Mother was granted a temporary restraining order against father, and she promised CFS that she would file for Family Court orders for custody of A.F. and have no contact with father. CFS therefore intended to maintain A.F. with mother, while maintaining L.T. in the home of his custodial father.

Despite her initially stated intention of separating from father, mother continued to have telephone contact with him in custody despite the restraining order precluding all contact, and she failed to seek a custody order in Family Court. Mother was homeless, living out of her truck with A.F. after leaving the home of her older child where she and A.F. had been allowed to stay. On September 22, 2019, mother left that home and informed the social worker she wanted to continue her relationship with father. She seemed depressed but refused to meet with the parent partner, and appeared to be under the influence of drugs or alcohol. CFS was concerned because mother continued to be in telephone contact with father while he was in jail despite the restraining order and had not followed through with obtaining custody orders. A.F. was therefore taken into custody by CFS and a dependency petition was filed alleging the parents failed to supervise or protect the child within the meaning of section 300, subdivision (b)(1).

3

Specifically, the petition alleged that mother struggled with substance abuse that impaired her ability to properly care for the infant, that father should have known of mother's substance abuse, but he failed to protect her, that father also struggled with substance abuse, that the parents engaged in domestic violence in the child's presence posing a substantial risk of harm, and that mother has untreated mental illness that impaired her ability to supervise and protect the baby. The petition also alleged that father was incarcerated and failed to provide for his child.

On September 30, 2019, the detention hearing was held, at which the court temporarily detained the child from the parents and placed the child in the care of CFS. The court ordered supervised visitation at a rate of either once per week for two hours, or two times per week for one hour. The court gave CFS authority to increase the frequency and duration of visits.

The jurisdiction report was filed on October 25, 2019, recommending that L.T.'s dependency be dismissed in light of the Family Law orders granting sole physical custody of the child to the custodial father. As to A.F. the report recommended continued out of home placement with reunification services. The report noted the social worker's concern that mother continued to have telephone contact with father, and that she had made concerning statements about planning to maintain her relationship with him. The domestic violence incident that led to intervention had resulted in fractures to mother's face. Mother was homeless but rejected referrals to a domestic violence shelters at which her child could have been placed with her.

4

The social worker learned that father had been a dependent child himself, was diagnosed with schizophrenia, bipolar disorder and attention deficit hyperactivity disorder (ADHD). He was prescribed several psychotropic drugs for his mental health issues but had not taken any medication since 2017. In discussing the domestic violence incident, father described himself as the victim, defending himself against mother. He denied a current history of substance abuse but admitted using methamphetamine until 2018.

The report also indicated mother had been diagnosed with depression in the past and was prescribed medication, but she stopped taking the medication, stating that her cats provided greater benefit. Mother expressed to the social worker that she had ended her relationship with father and was involved with someone new.

The jurisdiction hearing took place on October 30, 2019, at which hearing mother waived her rights and submitted the matter of jurisdiction on the social worker's reports. The court sustained all the allegations of the petition, declared the child a dependent of the court, removed custody from the parents, ordered family reunification services for the parents, and ordered supervised visitation with A.F. once per week for two hours. As before, the court authorized the social worker to increase the frequency and duration of visits, as well as authority to delegate supervision of visits to a third party, and to permit

unsupervised or overnight visits, by an approval packet. The court also ordered mother to submit to a psychological evaluation.[2]

In May of 2020, the social worker submitted a report in preparation for the six-month status review hearing. By this time, father was no longer in custody so both parents were homeless, living in their respective vehicles. Mother was working at a warehouse in Redlands while father got work from temporary workforce agencies. The report stated that in February 2020, the parents reunited, despite the outstanding no-contact order; father rationalized the situation by noting that his probation conditions authorized "peaceful contact." On three occasions, father had appeared at mother's visits, that had been taking place at a McDonald's restaurant. Even after leaving the visitation area, father watched the visits from outside, so the visitation location was moved to the CFS office.

On February 26, 2020, the parents' reunion started to break down again. Father contacted the social worker to report that he prevented mother from committing suicide by wrapping a phone cord around her neck, and that because she had been acting bizarrely, she should not be permitted to visit that day. That same day, mother contacted CFS to report a recent altercation in which father had pushed her to the ground; she denied any suicidal gesture but knew father would tell that to the social worker. Further investigation of the incident revealed that father had followed mother to the residence

---

[2] This psychological evaluation was ordered at the hearing but omitted from the minute orders by inadvertence, so a nonappearance review packet was employed to obtain the necessary authorization.

6

where her older son resided to pick up his "stuff" from her truck, that mother was the aggressor who charged at him, and that he was defending himself when he knocked her to the ground. Father stated that he left because the father of the older child threatened to call police.

The report also indicated that A.F. was thriving in the home of her caretakers and was bonded to them. Mother had completed a domestic violence program, parenting program, and had submitted to a psychological evaluation. However, she had not regularly complied with the drug testing requirements, and of the tests she did take, there were two tests with positive results for alcohol. Of concern to the social worker was that mother is a diabetic who had an insulin pump, but she had stopped using the pump. Her psychological evaluation included a diagnosis of major depressive disorder, which mother minimized by saying that all diabetics have depression because of fluctuations in their blood sugar levels.

Father had participated in his court ordered psychological evaluation but had gotten a late start on reunification services due to his time in custody. Of the services available, father had submitted four drug tests, of which three were negative, but the fourth test was positive for marijuana and methamphetamine. He had not consistently attended his drug or counseling programs, and he threatened the domestic violence instructor.

Regarding visits, the report noted that mother visited regularly at first and her visits were appropriate. She had completed most of her programs, but she had resumed

her relationship with father, her abuser, resulting in another altercation, indicating she had not benefitted from services. Both parents were presently homeless, but because of mother's consistency with visits, and the fact that father missed three months of services while incarcerated, CFS recommended continued services to both.

The six-month review report included mother's psychological evaluation, completed on January 31, 2020. The report indicated mother denied being in a relationship with Father, and stated she last had contact with him in December of 2019. The evaluator indicated mother suffered from major depressive disorder, recurrent episode, mild, and was susceptible to psychiatric decompensation when under stress. The evaluator recommended that Mother be closely monitored for suicidal thoughts and behaviors, indicated she had past difficulties controlling her anger, and that she was suspicious and distrustful of others. The evaluator also reported that so long as Mother was able to appropriately manage her depression, refrained from engaging in a domestic violent relationship, and obtained stable housing, she could resume her parenting role when deemed safe to do so.

The six-month review hearing was held on June 4, 2020[3], in the parents' absence, as a consent calendar matter, where the court continued the child in out of home

---

[3] CFS has requested that we take judicial notice of various documents relating to the Proclamation of Emergency signed by Governor Newsom on March 4, 2020 (Exh. A to req. for jud. ntc.), as well as the amendment to the California Rules of Court adopted by the judicial council on April 6, 2020, effective April 6, 2020, Appendix I, Emergency Rule 6 (c)(7); (Exh. B to req. for jud. ntc.), and general order of the Presiding Judge, dated April 8, 2020, regarding the Second Amendment to Implementation of Emergency Relief (Exh. C to req. for jud. ntc.). We grant the request for judicial notice. By the time

*[footnote continued on next page]*

placement and extended reunification services for an additional six months. The visitation order was continued unchanged, one time per week for two hours, with authority granted to CFS to increase the frequency of duration of services, or to delegate a third party to supervise.

The twelve-month status review report revealed that mother was homeless, living in her vehicle, but more recently was staying with a boyfriend's family. She had worked at the warehouse for one and half weeks before being "laid off" for a "work ethics" issue. After reconciling with father for three weeks in February 2020, she again reunited with him in May 2020. The social worker suspected they were living together because during video-chat visits, the caregiver noticed the same background for each parent, and mother could be heard coaching father over the phone. But there were more domestic violence incidents.

In August 2020, mother informed the social worker she had been hospitalized for reasons relating to her diabetes, and that she was done with father for good because he had broken the television in a motel in which they were staying and had bit her on the knee in separate domestic violence incidents. Her new boyfriend was father's brother.

Regarding visitation, father had missed several visits, citing as an excuse the fact he had been in an accident and did not want the child to see him because he was pretty messed up. As of September 2020, father had missed seven visits. At the same time, mother had missed a couple of visits because of her work schedule. Another concern was

---

of the six-month review hearing, the statewide Covid-19 Emergency Rule had been in effect for three months.

9

that mother's diabetes was not under control, resulting in at least one hospitalization since the last hearing. Mother did not complete the substance abuse treatment program, and refused to take psychotropic medication that had been recommended in the psychological evaluation.

The caregivers offered mother more time for her video visits. Since March 2020, the visits had been virtual due to the pandemic. Both parents complained that it was difficult to have a video visit with the child, who would crawl around during the visits. The caregivers had to follow the child around with the telephone to allow the parents to see the child. Father often cut his visits short. Although mother's visits were considered acceptable, father's visits were not. The parents continued to use substances and miss tests, and lacked stable housing or income. Because the parents had not demonstrated any benefit from services, the social worker recommended termination of services and that the matter be set for a section 366.26 hearing, with a goal of adoption as the permanent plan.

On January 8, 2021, the social worker submitted additional information to the court. The foster parents reported father had not visited since August 2020 although they continued to reach out to him weekly. Mother also had not visited consistently, missing some sessions. She had also missed four drug/alcohol tests, and the fifth test sample had leaked in transit so no result could be obtained. In November 2020, mother had asked what she needed to do to reunify, and social worker told her of CFS's concerns and that a

residential treatment center was recommended. However, mother did not sign the consents for the program, informing the social worker she needed to think about it.

On January 19, 2021, the contested 12-month hearing was held, but neither mother nor father appeared. At the outset of the hearing, mother's counsel stated mother's objection to the termination of services and reduction of visits but offered no evidence at the hearing. The court made the recommended findings and terminated reunification services because the extent of mother's progress was minimal with no probability of return within six months. Visits were reduced to one time per month for one hour by video chat. Because mother was homeless and was not present in court to hear the orders, CFS requested an order permitting service of notice on parents' counsel, submitting a declaration of due diligence recounting the efforts made to locate and serve her, which was granted.

The section 366.26 report was filed in May 2021, which referred to the problems encountered by the social worker in locating and serving the parents because their whereabouts were unknown. The adoptability assessment reflected that the foster parents are the only parents the toddler has ever known, that A.F. was healthy and that any delays that had been apparent previously were now resolved. Mother continued to visit by video chat, although she was authorized to visit in person once a month, subject to proof of a negative test "for an unspecified medical condition," which had not been provided by mother. During video chats, A.F. would greet mother, kiss the caretakers, and then run off, demonstrating the child did not have a close relationship with her birth mother.

11

The section 366.26 hearing was set as a contested matter and heard on June 10, 2021. Mother testified at the hearing that her visits were initially in-person visits at which she would hold, feed, change and talk to the baby. When her visits were reduced to once per month, she testified she was consistent with visits and never missed one until the Covid-19 pandemic, at which point visits were restricted to virtual visits by video chat.[4] Mother acknowledged missing approximately five visits due to her hospitalization, although she did not expand on the number or duration of the hospitalizations. She had resumed in person visits at the time of the hearing, with her last visit occurring in May, 2021.

Mother disagreed with the recommendation to terminate parental rights because her father had passed away in the past year and she did not want her child to see her mother upset because she lost her grandfather. After hearing all the evidence and receiving the reports into evidence, the court found by clear and convincing evidence that the child was likely to be adopted, and terminated parental rights. Mother timely appealed.

## DISCUSSION

On appeal, mother argues that the termination of parental rights should be reversed because the virtual visits by video chat prevented her from establishing a beneficial parent child relationship, in violation of her constitutional rights. Leaving aside the question of how the juvenile court was responsible for the statewide state of emergency

[4] The reduction of visits to one time per month did not occur until the 12-month review hearing, held on January 19, 2021. The video visits commenced in March 2020.

12

that led to the modification of the visitation protocols, a critical inquiry in any due process analysis where a judicial violation of constitutional rights is asserted, mother acknowledges that the issue was not preserved in the trial court.

Because visitation was converted to virtual visitation in March of 2020, any complaint about the deleterious effect this might have or was having on mother's visits should have been raised before the six-month hearing, in June 2020. She did not object to the reasonable services finding at that hearing, and did not request increased visitation at that time. Nor did she seek relief by way of extraordinary writ following the 12-month review hearing when services were terminated, although her testimony at the selection and implementation hearing made it clear she was aware of that order. CFS retained authority even after the six-month review hearing to increase the frequency and duration of visits, but mother never raised the issue of visitation in court or with the social worker, except to complain about the limitations of the video visits in the 12-month review report, but at this stage mother's visits were inconsistent and she did not fully comply with drug testing requirements.

CFS argues mother has forfeited any challenge to the frequency, duration, or manner of conducting visitation by (a) failing to seek extraordinary relief following the termination of services and reduction of visits at the 12-month review hearing, and (b) by failing to complain to the court about the nature, frequency, or duration of visits prior to the setting of the section 366.26. We agree the claim was forfeited.

13

a.      *Forfeiture*

Mother accurately notes that there is due process right to custody of one's child. We agree.  Parenting is a fundamental right protected by both the federal and state constitutions; a fundamental liberty interest protected by the Fourteenth Amendment. (*Santosky v. Kramer* (1982) 455 U.S. 745, 753 [102 S.Ct. 1388, 1394, 71 L.Ed.2d 599, 606], and cases there cited.)  But the fact parenting is a fundamental right does not mean the government has no interest in intervening in an appropriate case, acting as *parens patriae*.  "Two state interests are at stake in parental rights termination proceedings -- a *parens patriae* interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings." (*Id.* at p. 766.)

In this case, although mother argues that the *court* violated her constitutional rights, the gravamen of her complaint is that the Emergency Amendment to the Rules of Court deleteriously impacted her ability to maintain a parental relationship with her child. A different analysis is required to review the constitutionality of a statute or rule, than is used to evaluate an order or judgment by the court that violates constitutional rights.  A facial challenge to the constitutionality of statute or rule or an order is a pure issue of law that may be raised for the first time on appeal.  (*Hale v. Morgan* (1978) 22 Cal.3d 388, 394; see also, *In re J.C.* (2017) 13 Cal.App.5th 1201, 1206 [facial challenge of Penal Code section 290.008].)

But mother does not raise a facial challenge to the constitutionality of the amendment to the rules of court or the emergency orders that impacted the manner in which visitation would take place during the Covid-19 pandemic. Her due process claim, by necessity, involves a mixed question of law and fact, rather than a pure question of law; it is therefore subject to forfeiture.

As one court observed, "'Typically, constitutional issues not raised in earlier civil proceedings are waived on appeal.'" (*Fourth La Costa Condominium Owners Assn. v. Seith* (2008) 159 Cal.App.4th 563, 585, quoting *Bettencourt v. City and County of San Francisco* (2007) 146 Cal.App.4th 1090, 1101.)

In *Neil S.*, Neil provided no points and authorities in support of his original petition to establish paternity, and he did not discuss any constitutional provisions or violations in his accompanying declaration. In opposition to respondent's motion to quash, Neil made various arguments without directly suggesting an equal protection challenge, though he did argue respondent's marriage should not be given "priority" over his marriage. Without addressing the constitutional claim directly in his supporting papers, the court considered his arguments too tenuous to make an arguable equal protection claim in the trial court. (*Neil S. v. Mary L.* (2011) 199 Cal.App.4th 240, 254-255.)

The *Neil S.* case involved an equal protection argument vis-a-vis Family Code section 7611 in order to avoid a forfeiture of the claim, but his claim did not involve a facial challenge. Similarly, mother's argument in the present case also does not assert a

15

facial challenge to the rules and executive order that impacted her visitation, but instead attempts to craft a due process claim regarding the juvenile court's orders that resulted in video visits during the pandemic, and reduced visits after the termination of services. A challenge to judicial action in a specific proceeding that arguably impacts constitutional rights is not a pure question of law. It requires a review of facts on which the judicial order or judgment is based in order to evaluate the constitutionality of the order. That, in turn, requires that the court be made aware of the claim by a timely objection or other assertion of the right.

It is well understood that even constitutional rights may be waived or forfeited by failing to act to preserve the right. It goes without saying that the forfeiture rule extends to due process claims. "[A] right may be lost not only by waiver but also by forfeiture, that is, the failure to assert the right in timely fashion." (*People v. Barnum* (2003) 29 Cal.4th 1210, 1224, citing *Yakus v. United States* (1944) 321 U.S. 414, 444 [88 L. Ed. 834, 64 S. Ct. 660] [stating that "[n]o procedural principle is more familiar . . . than that a . . . right," even a "constitutional right," "may be forfeited"]; accord, *United States v. Olano* (1993) 507 U.S. 725, 731 [123 L. Ed. 2d 508, 113 S. Ct. 1770]; *People v. Collins* (2001) 26 Cal.4th 297, 305, fn. 2; *People v. Simon* (2001) 25 Cal.4th 1082, 1097, fn. 9.)[5]

---

[5] Relief from forfeiture is permitted where certain fundamental constitutional rights have been violated (*People v. Vera* (1997) 15 Cal.4th 269, 276-278 [referring to the fundamental rights applicable to criminal defendants, such as right to a jury trial, right to not be placed twice in jeopardy]; *People v. French* (2008) 43 Cal.4th 36, 47 [limiting relief to violations of state or federal constitutional rights]), or where the issue involves a pure question of law. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 884-885.) However, the substantive due process right to custody of one's child is not one of those rights.

"A parent's failure to raise an issue in the juvenile court prevents him or her from presenting the issue to the appellate court."  (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 582; see also, *In re Sheena K.*, *supra*, 40 Cal.4th at pp. 880-881 [even constitutional rights may be forfeited by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it]; *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"]; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221 ["a party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court"].)

Mother acknowledges these principles but asks us to follow the rule that application of the forfeiture rule is not automatic.  (*In re S.B., supra,* 32 Cal.4th at p. 1293.)  She points to the fact that the court and parties were aware of mother's homelessness and attempts to excuse her failure to file a writ petition following the termination of her services and the reduction of her visits by asserting lack of notice. However, mother does not offer an explanation for her failure to maintain contact with her attorney to find out what transpired at the hearing, of which she did have notice, never sought housing assistance to alleviate her homelessness during the reunification phase of the dependency, did not seek review of the reasonable services finding in a timely manner, and did not explain in her testimony how her homelessness prevented her from preserving an ongoing claim by either discussing it with her attorney, or the social worker, or raising it at any of the hearings.  Because mother's homelessness had not

precluded her from making other court appearances or participating in video visitation, the issue would require a fuller record to be addressed on the merits.

It is also significant that mother never requested to increase the frequency or duration of her visits although at each hearing, the court authorized CFS to do so at every hearing prior to the critical 12-month review where services were terminated. In this manner, she acquiesced in the prior orders requiring virtual visits due to the pandemic that are now final, and cannot complain for the first time on appeal from the most recent order. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 10, quoting *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018 ["'An appeal from the most recent order in a dependency matter may not challenge earlier orders for which the time for filing an appeal has passed.'"].) Under section 395 and decisions interpreting it, mother may not challenge the inadequacy of video visitation, in effect since before the six-month review hearing, through an appeal from the June 2021 order terminating her parental rights.

While we have discretion to reach the merits of a forfeited claim, the Supreme Court in *In re S.B., supra,* reminds us that " . . . the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue. [Citation.]" (*In re S.B., supra,* 32 Cal.4th at p. 1293.)

We cannot excuse mother's failure to preserve her visitation rights for review where she was aware of the recommendations prior to the hearing, as seen from her comments to the social worker in the additional information supplement to the 12-month review report about what she should do to reunify. Mother had several opportunities to

object to the reasonable services findings at the six-month review hearing as well as at the 12-month review hearing or to request additional and longer visits. Until the 12-month hearing, the social worker had the authority to increase visits, but mother failed to do so. Mother's counsel did object to the termination of services at the contested 12-month review hearing, but no objection to the virtual visits was interposed. She also failed to avail herself of other procedural vehicles, such as a section 388 petition, to seek modification of the visitation order at any point up to the 12-month review hearing and the termination of services, in order to preserve the right she now so ardently pursues after it is lost.

"'"'The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them." [Citation.]' [Citation.]" (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.) "[A] parent [may not] wait silently by until the final reunification review hearing to seek an extended reunification period based on a perceived inadequacy in the reunification services occurring long before that hearing. [Citation.]" (*Los Angeles County Dept. of Children etc. Services v. Superior Court* (1997) 60 Cal.App.4th 1088, 1093.)

Additionally, mother's inability to establish a beneficial parent-child relationship was not, as she describes it, "through no fault of her own." Instead, it is attributable to her own lack of motivation in pursuing increased visits or objecting to the reasonableness of services. More importantly, mother has not established that her failure to establish a relationship with her child was due to the court's orders, as opposed to the facial validity

19

of the emergency rules—in the absence of any attempt to bring the issues to its attention—or that the court could be held responsible for helping parents "establish" a beneficial parent-child relationship, where one never existed. The challenge was therefore forfeited.

Mother attempts to avoid a forfeiture by arguing that she was deprived of effective assistance of counsel when her attorney failed to make the appropriate objection to video visitation or to request increased visits. A parent claiming ineffective assistance of counsel must show that his or her attorney "failed to act in a manner to be expected of reasonably competent attorneys practicing in the field of juvenile dependency law" and that the "claimed error was prejudicial." (*In re Kristin H*. (1996) 46 Cal.App.4th 1635, 1667-1668.) It is not necessary to examine whether counsel's performance was deficient before examining the issue of prejudice. (*In re N.M.* (2008) 161 Cal.App.4th 253, 270 citing *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1180.) A court may reject a claim of ineffective counsel if the party fails to show the result would have been more favorable but for trial counsel's failings. (*Nada R., supra*.)

Here, the record is inadequate for us to conclude there is no adequate explanation for counsel's actions, particularly where mother was not compliant with drug testing, had maintained an on-again, off-again relationship with father whose violence led to CFS intervention, and had not maintained contact with counsel to find out the results of the hearing she missed. Further, on this record, mother has failed to demonstrate prejudice,

insofar as the record does not establish a reasonable probability that the outcome would have been more favorable had counsel objected to the virtual visitation.

b.      *There Was No Due Process Violation*

On the merits, mother claims that her visitation rights were terminated with no finding of detriment, as required by section 362.1, in violation of her constitutional rights. However, she cites to no point in the record where the court suspended or terminated visitation, which is fatal to her claim pursuant to section 362.1.

Under section 362.1, subdivision (a), visitation with the parent is a mandatory element of the reunification plan with the single exception that "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B); see *In re S.H.* (2003) 111 Cal.App.4th 310, 317 & fn. 9.) But here, the court did not terminate visits; instead, it reduced visitation to one time per month, as it was authorized to do, after it terminated services at the 12-month review hearing.

When reunification services have been ordered and are still being provided, some visitation is mandatory unless the court specifically finds any visitation with the parent would pose a threat to the child's safety. But the "frequency of such visits, in contrast, depends on a broader assessment by the court of the child's 'well-being.'" (§ 362.1, subd. (a)(1)(A); *In re C.C.* (2009) 172 Cal.App.4th 1481, 1491 citing *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008 [court may deny parent visitation "if visitation would be harmful to the child's emotional well-being"].)

21

Nevertheless, pursuant to subdivision (h) of section 366.21, when reunification services are terminated and a section 366.26 hearing set, "[t]he court shall continue to permit the parent or legal guardian to visit the child pending the hearing unless it finds that visitation would be detrimental to the child." The juvenile court determines "when, how often, and under what circumstances visitation is to occur." (*In re Shawna M.* (1993) 19 Cal.App.4th 1686, 1690.)

Mother was provided with visitation throughout the dependency. Visitation continued even after services were terminated, although the frequency and duration were reduced, as the court was authorized to do.

Mother relies on cases involving termination of visits, but cites no authority requiring the juvenile court to make a finding of detriment before reducing visitation after services are terminated and adoption has been identified as the permanency plan. Where, as here, reunification services have been terminated, the focus shifts from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317), and "[s]ection 361.5, subdivision (f) gives the court *discretion* to allow the parent to continue visitation with his or her child unless it finds that visitation would be detrimental to the child." (*In re J.N.* (2006) 138 Cal.App.4th 450, 457.) The best interests of the child "is certainly a factor" the court may consider in exercising its discretion to permit, deny, or reduce visitation. (*Id.,* at p. 459.) But there is no requirement that a court find detriment when it reduces visitation upon the termination of services.

Because reunification was no longer the goal in this case, it was within the juvenile court's discretion to fashion a visitation order that focused on A.F.'s need for permanency and stability. The court could reasonably conclude those needs were not promoted by maintaining frequent visitation with mother, where A.F. did not have a close and strong bond or attachment with mother, despite being given the opportunity to increase visits in frequency and duration up until the hearing at which services were terminated. (*In re Megan B.* (1991) 235 Cal.App.3d 942, 953; see also, *In re S.H.* (2011) 197 Cal.App.4th 1542, 1558-1559 [where reunification services not being provided, no requirement that visitation be as frequent as possible].)

Mother also argues "it was error for the court to order only video visitation when her reunification services were terminated and in addition the prior video visitation should have been brought to the court's attention in relation to the question of reasonable services. (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1489-90 [detriment required to deny visitation]; *In re T.W.* (2017) 9 Cal.App.5th 339, 346-48; *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425-27 [no reasonable services where visitation is unduly limited].)" Mother also relies on *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1508, but her reliance on all the authorities cited in this context is misplaced. The *Hunter S.* case involved a situation where the social services agency improperly delegated discretion over visitation to the child and his therapists, which amounted to an abuse of discretion. The cases of *C.C., T.W.,* and *Tracy J., supra,* all involved termination or denial of visits. None of these authorities aid mother's position.

23

Mother has not established a due process violation. "The essential characteristic of due process in the statutory dependency scheme is fairness in the procedure employed by the state to adjudicate a parent's rights." (*In re James Q.* (2000) 81 Cal.App.4th 255, 265, citing *In re Crystal J.* (1993) 12 Cal. App. 4th 407, 412.) Due process also connotes a "hearing appropriate to the nature of the case." (*Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 313 [70 S. Ct. 652, 657, 94 L. Ed. 865, 872].) Due process is a flexible concept, one whose application depends on the circumstances presented. (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 757.)

Here, although mother argues the court ordered visits to be conducted via video, that is not supported by the record. Mother's own testimony demonstrated she had in person visits after the 12-month hearing, leading up to the section 366.26 hearing. Mother's due process rights were not violated by the decision to reduce visits after the termination of reunification services.

Thus, mother's inability to make a showing that there was a beneficial parent-child relationship was not caused by the court's orders or the emergency orders and rules under which the court was required to operate in light of the worldwide state of emergency. Cloaking mother's failure to act timely to reunify in an abstract discussion of constitutional principles without a showing of how the court violated her rights is not a substitute for asserting, protecting, and preserving one's rights.

There was no violation of mother's due process rights.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____
                                                           P. J.


We concur:

MILLER_____
                    J.

SLOUGH_____
                    J.

25